Biological Diversity v. United States Forest Service So how many years? How much use per year? I guess – and where is any of this in the record? Because the only – you know, the statement that I read in the record is pretty much what I can tell the Forest Service says. So all of this information that you're providing, can you give me a record site of where you actually have this criteria open so the public can comment on it? So I'll point again to the annual monitoring reports because that's where the Forest Service goes out and determines. And one of the monitoring reports talks about this gun club road where they see repeated use. That's where they talk about the idea of chronic uses being those that count against density. It still doesn't answer the question of what metric does the service use to say this use has gone from non-chronic to chronic? The Forest Service has to see use in at least more than one year. I don't know at what point it tips over the line. I haven't seen – And where is that definition of that methodology in the record? I don't – I'm hearing this actually for the first time. So where is that? I understand the court's concern. The Forest Service is implementing something that is silent in the forest plan itself. So this is really an application of a standard to specific facts on the ground. So what we're dealing with is, as you read, Judge Koh, that's on one side of the line, the temporary non-chronic use that's sporadic. And that's a factual finding that the Forest Service makes. But why wouldn't this disclosure be important so that the public could comment on it? Well, I mean – I mean, if there's all this criteria that the Forest Service is using and it's, from what you say, silent. I don't think there's any problem here with public comment. I think the Yaak Valley Forest Council and others have consistently petitioned the agency to look at this stuff, and the agency's done so. I think that the diligence is reflected in the Forest Service's responses to those comments. And I would just encourage the court to look at the Probert case. The comment here is that there's a substantive standard that the service has to comply with, and the service took a position that we don't have to count certain unauthorized use because it's not chronic and because we repair breaches promptly. Now, the second assumption has been, I think, not defended as supported by evidence in the record. And you said, well, that's essentially a harmless error that we made an incorrect assumption because, actually, the use is not chronic. So there's still no problem. But now we're just – how are people – I mean, essentially, that's a – right, if the use is actually chronic or it is actually having an impact, there would be a substantive violation. So there needs to be some criteria for determining whether it is chronic or not. I understand the court's concern. I think the explanation that the Forest Service provided – and I just want to take a step back again. This is a – this is not about the effects of this project itself. This is a background issue. So I think the level of detail that the Forest Service needs to go into is somewhat lessened. I will not say that that does not make the issue important. I think the Forest Service really pays attention to this stuff. I think when it notices chronic use, as with the Gun Club Road, it counts that use against its metrics. And I think that the district court was too demanding in requiring – It just seems like a naughty pine. The Forest Service made the same arguments, right? Use is not chronic. We repair it promptly. And there, the district court said, no, you do need to include it in your road density calculations. So it just seems like – And we think that was wrong. I mean, we think the – What was wrong? That it was factually wrong or that it was wrongly decided? It was wrong to require both in – and I'll focus on this case because this is the case on appeal. But it is incorrect to require only one methodology of the Forest Service. When the forest plan itself does not specify how the forest ought to be dealing with this, the Forest Service has discretion and the idea that it must count something because, you know, because there's a one- or two-times trespass. I don't think anybody is saying that. Okay. Right? But I think it – But certainly if there were chronic use, or then I think you are acknowledging that would essentially have to be counted then as any other road for which there is authorized use. And the problem is that Forest Service's assumption as to why it should treat certain unauthorized use as non-chronic is not supported, either by criteria or evidence in the record. I don't think that's – We check for it. We build the barriers. Right? We fix the barriers when they're breached. But the evidence in the record, at least, is a counter to that assumption. I don't think that's right. Let me first take the standard question. So the district court after the – sorry, the District of Montana in 2019 in the Probert case remanded to the agencies to consider unauthorized road use that it knew to be chronic. That was what was remanded to the agencies. And after that, going forward, the agencies no longer make any assumption that road use is not chronic just because it's illegal. So now, in cases where it is chronic, following the guidance from Probert in 2019, the agencies count that use. When it's not, I understand Your Honor's concerns about specific individual breaches, but the Forest Service is monitoring every year, and I think getting to that level of granularity is inconsistent with the APA's standard of review. Can I ask one quick question over your time? The federal defendants are not joining the tribe in its appeal of the center's first claim. Is that right? That's right. Okay. So then who would bear the burden of proving harmlessness if the federal government is not appealing that? Is it the tribe or is it the plaintiffs? So my understanding of the harmless error rule under the APA is that the plaintiff typically bears the burden of showing prejudicial error. Now, we haven't taken a position on that in this case, but we do have a discussion of harmless error elsewhere in our brief with respect to our NEPA issue. So you may find some guidance in case law in that section. And why isn't the federal government joining the tribe in that appeal of that claim? That's a decision that rests with the Solicitor General. We haven't been authorized to join that, and so I can't take a position on that. Okay. But generally, it would be the government's burden to show harmless error, right? I don't think so. I mean, that's not consistent with my background understanding, but I haven't taken a position in this case.  All right, thank you. Thank you. You've gone over your time by five and a half minutes, but I'll give you two minutes for rebuttal. I appreciate that, Your Honor. Thank you. Okay. May it please the Court, my name is Julie Wise, and I represent the Kootenai Tribe of Idaho. And with me today is the tribe's Attorney General, Mr. Billy Barquin. Welcome. Your Honors, the tribe urges the Court to affirm the district court on the no jeopardy determination, but to reverse on three issues, the unauthorized road use, the ESA baseline issue, and the NEPA existing condition issue. It helps to understand why the tribe is here, so I'm going to start with that. The Black Ram Project is located in the tribe's aboriginal territory. That is the area where the tribe has reserved rights for hunting, fishing, and gathering. And the tribe's creation story is central to why the tribe is here, because it holds the tribe was the Kootenai people were put on this earth to keep the creator spirit's covenant by guarding and keeping the land, and by doing so, the land in return would provide for the people forever. This project is consistent with that purpose, their main purpose. And it is consistent because it is consistent with the tribe's own proactive and holistic approach to land management in Kootenai Territory. The tribe historically employed fire on the forest landscape with the creation of the national forest that stopped. And the result has been a forest that is much less resilient and that endangers natural resources. So the tribe is very focused on restoring the resiliency to the forest, protecting those natural resources, and protecting the people, because that lack of resiliency also actually threatens people living particularly in the wildland-urban interface, where people in their property are in really close contact with these natural resources on the forest. The project will treat wildland-urban interface. There's only 3,900 acres of commercial harvest in this project. And 38% of that, the record shows, is in the wildland-urban interface. The record also shows that there have been many fire starts over the last decades in the wildland-urban interface. So it's really important to allow this project to proceed. And of those resources that the tribe is so concerned about, one of them is the grizzly bear. The tribe is committed to conservation of the grizzly bear and, in fact, serves as a representative on the interagency grizzly bear committee for this particular ecosystem, the Cabinet Yak ecosystem, this recovery zone. So the tribe understands that it's important to actually restore the forest so that you can protect all the species, including a species of great importance like the grizzly bear. I had intended to jump right to the existing condition issue, but I'd like to first address a few points, if the court would, on the unauthorized road use. Your Honor, Judge Koh said that the forest plan doesn't talk about unauthorized versus authorized roads. Well, it also does not talk about the – it does not define the term effectively restricted. And we explained in our brief that this issue of effective restriction dates back to 1994, when the interagency grizzly bear committee recognized that they needed to have some consistency on how it was talking about these roads. And it, first of all, came up with a definition in 1994, at 8 ER 1891, that a restricted road requires physical obstruction, generally gated, and motorized vehicle use is legally restricted. Now, the word effective restriction came into play four years later in 1998. And the word effective was added. You'll find that at 5 ER 1038. And the IGBC added the definition and said, a restricted road requires effective physical obstruction, generally gated. It did not define the term effectively. And the biological opinion that is currently in place for the forest plan relies on that 1998 report. If you look at 5 ER 1000, that's term and condition number one in the biological opinion, it says, when managing motorized access, the forest shall use devices or methods on restricted roads that are consistent with those recognized by the IGBC. And then it cites that 1998 report. So we have this issue of the Forest Service needing to make sure that these roads are effectively restricted, but there's no definition of effective restriction. And this is important because we know that under Ninth Circuit case law, including Weldon, cited in the brief, it's at 697 F3 1043. The Penn site is 1056. The Forest Service's interpretation and implementation of a forest plan is entitled to deference. And respectfully, the district court did not give any deference. And it's important that this court not fall into that same trap of trying to second-guess what the agency was doing, because the agency is going out there and trying to do the best it can to make sure that the grizzly bears are protected. And the Kootenai tribe totally supports that effort. If you look at Gassman, the Gassman decision that we cited, that is, I believe, that was ‑‑ I'll give you the site for that. Gassman was at 2023 Westlaw, 4172930, a recent unauthorized road use case out of the District of Montana. The court said, well, in this case, okay, we've got the situation in Martin 1 where it can't be speculative. You actually have to have some evidence. And then we've got the situation in Probert where, you know, a lot of evidence, okay, that's unauthorized use. That's arbitrary and capricious. In Gassman, it was in between. And the court said, you're more like Martin 1. You know, this is more like just speculative unauthorized road use. And that's important because Gassman actually found an earthen berm rate failure of 35%. And the district court in this case recognized that effective closures are not 100% effective at reducing unauthorized road use. So I think the proper analysis here is you have to look at the totality of the evidence. No one case is going to be determinative. We know there has to be something more than speculation, and evidence like in Probert was enough. But importantly, please, Your Honors, take a look at that 2020 Barrier Monitoring Report because this case is about a project. It is about a site-specific project. And we know, based on that 2020 Barrier Monitoring Report, we know at 5ER1115 that in the 2020 barrier, there was no unauthorized use in those units. The units in this project had no unauthorized use. We also know at 5ER1117 that there was only one instance of unauthorized use involving a user-created road, and that was in Unit 15. Your Honors, also, if you look in the record at 5ER1130, there's email correspondence where the Forest Service explains, well, Unit 14 doesn't really have an issue because its location and difficult terrain mean that, you know, there's very few instances where people are going to go into that area. Unit 15 is a little bit different, and they said that they are promptly remedying the breaches, except for – to your point, Judge Sung, about where do they say that they deal with chronic roads. They said except for Road 5890, which is treated as permanently open due to chronic unauthorized use. So this is a case, your Honors, where we're talking about a site-specific project, Units 14 and 15, that appear to have very little, if any, unauthorized use. And we have to think about the difference between Martin 1, where the court said, okay, speculation is not enough, and Probert, where really hard evidence, a lot of evidence of unauthorized use is enough. This case is in between, and it really is much farther down to the Martin 1 situation where these unauthorized use allegations are speculative. The last point I will make on that is if you look at the tribes, the disputed statement of fact, where we went through the actual photographs that had been submitted on these – you know, the photographs of allegedly breached gates and berms and things like that, and the Forest Service identified, as government counsel said, one by one by one by one, and there was no problem. This is speculation. This is like Martin 1, and for those reasons, the court needs to defer to the agency's interpretation and treatment of its forest plan. I'm happy to answer any questions of the court regarding the other issues in the case, including existing condition, which we do believe that the existing condition was harmless error that we demonstrated. The difference in the number of bears between 2020 and 2017 was not significant. In 2020, there were estimated 60 bears, and in 2017, it was 55 to 60. So new data would not have made a difference here, and the tribe does not support encyclopedic looks at issues that don't rise to the level of significance. Particularly where doing that simply delays the protection of natural resources of importance to the tribe. And the court should have recognized that the harmless error rule, which needed to be applied in this situation, indicated that new additional evidence would not have made a difference. But why wouldn't it have other data in the updated study, like recent bear mortality not impacted the Forest Service's analysis? And why wouldn't it have, you know, at least material impact, have a material impact on public participation? Your Honor, the public was able to participate fully because the number of bears was the same. But their comment may have been different, right, if you had all of the data that was in the updated study. If they had all of the data. Including on recent bear mortality. The recent bear mortality actually, Your Honor, the information shows that the bears are only trending upward. We cited in page 33 of our brief, it's a continuation of footnote 7, that the 2022 data now has the estimate up, I believe, 65. The most recent report that's available publicly online has the number at 67. So there is no indication that, you know, I think perhaps you're thinking of the mortality, Your Honor, that was discussed in the context of the ESA baseline. That mortality is included in the analysis at all times. I'm not talking about that issue. We're talking about the harmless error on the appeal that the federal government is not joining you on. Yes. You're over five minutes over your time. Let me see if my colleagues have any more questions for you.  Okay. Thank you very much. Thank you for the helpful argument. Good morning, Your Honors. May it please the Court, my name is Andrea Zaccardi. I represent Appellees and Cross-Fallon Center for Biological Diversity, Yaak Valley Forest Council, and Wild Earth Guardians. This case challenges a commercial timber sale. Since time is limited, I apologize for interrupting, but I do want to go to the argument we just heard from the tribe about claim 1, I believe, which is where the district court found error on the use of the older report versus the newer report to determine the baseline. And I understand the tribe's argument to be because the numbers for the baseline only improved, that was harmless error. And when I read your response to that, I see you conflating your argument about what should have been consulted in the baseline and saying, well, it wasn't harmless error because they actually shouldn't have been consulting the reports at all, but they should have been consulting what we consider to be the proper measure for the baseline. Do you have any other response to the harmless error argument made by the tribe? Yes, Your Honor. I'll start by saying that the burden is on the agency to show harmless error. Yes. The agency here didn't even argue harmless error, only the tribe did. So I will make that point clear. But what's the significance of that, that the federal government is not joining? You're saying then it's the tribe's burden? Well, it's at least the party seeking to have the rulings set aside, and we do have citations for that if you need them. But the problem, the main problem here is that over the past several years, grizzly bear mortalities have been increasing. And at the exact same time, detections of grizzly bears have been decreasing. From 2018 to 2020, we saw four female mortalities and two cubs of an unknown sex compared to 2015 to 2017, where we only had one female bear killed. So I see you saying, if I'm understanding you correctly, you're essentially going back to what is really your argument about how to determine the baseline and how to determine population growth and mortality. The service's response was, you know, we're going to look at this report. We think that's the best scientific method, and you disagree with that. So the numbers you're citing are from your method, not the service's. Is that correct? No, the numbers I'm citing are actually from the case from the annual reports. From the report. So the two reports that are issued. Because my understanding is the error identified by the district court was the consideration of, I believe, the 2018 report versus a 2021 report. I might have the years slightly off. But these are two reports. My understanding of one of your claims is they shouldn't really be using these reports at all, right? They should be using the counts. No, not at all, Your Honor. We don't take issue with anything that the Fish and Wildlife Service has considered in reaching their population estimate. We're not challenging the model. There's no direct challenge there. The problem is there is recent available biological data that the Fish and Wildlife Service doesn't analyze at all in the biological opinion. Okay. Well, I read the district court's opinion as saying there is an older report and a new report. The failure to consider the newer report was error. And then I read the tribe saying, well, that was harmless error because the information in the two reports actually only shows improvement. Can you address that argument? Yes. With specific sites to the record. So the harmless error argument only goes to the Forest Service's analysis in their environmental assessment. The Forest Service analysis, the data that they used only went up until 2017, even though the environmental assessment was published in 2022. So there's absolutely no data from 2017 to 2022 included in that EA. That is the document that goes to the public for public comment. So the public has no idea what's happened to grizzly bears, that these mortalities have been increasing, that detections have gone down. So what is the specific difference in information between the two reports that you're saying would have materially affected public comment or the Forest Service's decision? Can you point me to something specific from one report to the other that changed that you say would have materially affected either the decision or public comment? Yes. So there's several reports, but at 4ER749, which is the, I believe, the 2021 report that has data going through 2020. Can you give me that site again, please? Sure. It's 4ER749. That is where we see that there's been four times as many female grizzly bears killed than the last previous three years, and that's actually as many— those female grizzly bears is as many grizzly bears that actually have been killed from 2009 to 2015, so even the previous seven years. And then that trajectory, unfortunately, has only continued. So in 2002, we had three female grizzly bears killed, and Fish and Wildlife Service biologist Wayne Caseworm said that's the highest number of female grizzly bears they've seen killed in any single year since they began monitoring back in 1983. I guess the question I have is I'm looking at the Caseworm 2021 report, and it seems to pretty extensively discuss mortality. If I look at 4ER749, 4ER765, 4ER771, and you have the declaration from Caseworm, who is the biological scientist who did this, who said, look, you know, we are considering mortality in our analysis, and just doing tree rubs and these sort of one-off isolated, that's not scientifically best available science. So why isn't the agency entitled to some deference on this? So, Your Honor, the annual report that you're citing to is not the biological opinion. So the agency action needs to be upheld on what the agency articulated in the biological opinion. Just having that report in the record is not enough. Ninth Circuit case law is very clear on that. But that's what the Fish and Wildlife Service relied on for its biological opinion was this report. They relied on parts of the reports for sure, but they didn't address the fact that mortalities are rising and detections are going down at the exact same time. As for the detections, you're correct that the biological opinion said that you can't consider the drop in detections, or actually it didn't reference the drop in detections, just you can't reference detections in general as the sole population estimate. And we've never said that. We've never said you detected 50 grizzly bears, so you just take that number and say that's the population. What we're saying is when you have an increase in mortalities and a decrease in detections at the same time, that is important information that the agency should be considering, especially with a project that is going to move forward and impact grizzly bears negatively additionally. And this information is important information that the agency didn't consider because the grizzly bear population growth and persistence relies on female grizzly bears that are successfully reproducing and rearing young, and the biological opinion says that survival and reproduction of each individual grizzly bear is very important for this small population to survive and recover. Would you agree for the jeopardy determination there's a difference between slowing the rate of recovery of the grizzly bear versus appreciably reducing the likelihood of recovery? There is a difference, correct? There is a difference, Your Honor. I think on the jeopardy claim... So why wouldn't any temporary impact to the reproduction of a few individual female grizzly bears just be slowing the rate of recovery versus appreciably reducing the likelihood of recovery? Well, even though we're only talking about three female grizzly bears, that's actually nearly 20% of all adult female grizzly bears in this small population. So we're not really talking about minimal numbers, even though the agency tries to frame it that way. And they say that temporary impacts won't be a problem, but we're actually talking about female grizzly bears that may not be able to reproduce for one to two reproductive cycles. That means they're not rearing young that also reach adulthood and reproduce and contribute to this population in the future. So I think the impacts are actually a little longer than the agency is willing to admit. While I admit that it's impossible to calculate how long those impacts will impact the recovery of this population, I think it's longer than the five years that they say will be the impact. And 20% of female grizzly bears is a pretty substantial number. And it's also important because this project area has been specifically really important for female grizzly bears over the past several years. The area for decades has supported reproductive females that have contributed to the population. And as recently as 2021, which is the year before they finalized the biological opinion, there were two known reproducing females observed in this action area. You are a minute and a half over your time. Let me see if my colleagues have any more questions for you. No, I'll just give you a few seconds to wrap up. Thank you. Thank you. Appreciate it. In conclusion, we ask that the Forest Service affirm the district courts holding that the Fish and Wildlife Service violated the ESA and the Forest Service violated the National Environmental Policy Act by disregarding information and that you reverse the district court's finding on no jeopardy. Thank you. Rebecca Smith Good morning, Your Honors. May it please the Court, my name is Rebecca Smith and I represent the Appellees Alliance for the Wild Rockies and Native Ecosystems Council. I'd like today to just respond to six questions that the Court just asked to opposing counsel on the Access Amendment Road issue. Starting with Judge Sung, you asked, you couldn't remember the exact numbers, but you were discussing the issue of whether roads are promptly repaired. The citation for that is 5 ER 1068. And the numbers there were that in the only monitoring report the Forest Service has included in the record, 32 barriers were breached, zero were repaired, 40 gates were breached, nine were repaired. And as you noted, although the government on appeal in oral argument today is making arguments that it does fix things, it's just not in the record. We just don't have that in the record before the Court. Similarly, Judge Koh, when you asked where is the methodology that says how and when they determine whether a road has become chronic enough to include in the road density calculations, you asked where is that method in the record, and the answer is that it's not in the record. And that does make it an impermissible post hoc rationalization under the Supreme Court's well-established precedent in State Farm, 463 U.S. at 50. This Court may not accept counsel's post hoc rationalization for agency action. So my understanding of the service's argument on the repair issue is, well, we are limited in resources, so we can't actually repair all the breaches as quickly as we'd like, but that assumption or statement we made is essentially harmless because it still remains true that the unauthorized use is only occasional, not chronic in these areas, and that we have evidence of that because we monitor, and when the use becomes chronic, we do, in fact, treat it appropriately. Can you respond to that argument? Yes, Your Honor. I'd like to address that in three ways, first by looking at the project-specific biological opinion, then by looking at the forest plan biological assessment, and then by looking at the district court's decision in Probert, which the Forest Service appealed and then withdrew its appeal. So first on the specific issue of whether illegal use is a reoccurring problem in this project area, the U.S. Fish and Wildlife Service at FER0922 stated that it did have the Forest Service's annual monitoring reports, and in this action area, so in this project area, there was, in fact, illegal use in at least, it says, three of the eight years. I'm sorry, the citation is 2ER263. According to data provided by the forest from barrier 2012 through 2020 monitoring reports, illegal motorized use was observed in the action area in three out of the eight years. So this is a reoccurring problem. Second, the Fish and Wildlife Service goes on to say that it looked at those public photos from the Yaak Valley Forest Council, and what it found is that those photos corroborated illegal use. It says that the Yaak Forest Council's report highlights multiple gated or bermed roads that may have been bypassed by all-terrain vehicles or motorcycles. In addition, a few user-created routes. The reports further corroborate data from the forest. So it's 2ER263. So the Fish and Wildlife Service did not, as the interveners do, just dismiss the Yaak Valley report as false. They looked at those pictures, and they found that those reports were valid and corroborated data from the Forest Service. Second, Your Honor, I want to- I think there's your position that that level of use actually makes it chronic. Thank you. Yes, Your Honor, and that goes to the issue of Probert. The DOJ today, the Forest Service Council, gave a sort of brief summation of Probert that was actually inaccurate. What happened in Probert was that prior to 2020, the Forest Service did include illegal motorized use in its calculations. You can see this at 7-ER1544, where they say this is the Forest Service in 2020. To err on the side of the bear and show all potential effects, if illegal motorized access has occurred on a restricted route, the route is analyzed as open for the entire bear year, even if the route may only receive little or short-term use. That was their position in 2020. They did include that illegal use. And the reason that matters as it pertains to the Probert case is that Probert was, therefore, able to take calculations that included illegal use. And what Judge Malloy found in Probert is that when it looked at the illegal use in the calculations, those standards had been exceeded in eight years. He was able to take illegal use, legal use, put them together, and find that together those numbers actually exceeded and violated the Access Amendment standards in a number of years. And so what he found, though, was that it wasn't illegal use on the same road any particular year. And so he said, you know, in this year it might have been this road, in this year it might have been this road, but when we look over time, every single year we end up with the forest land violation. And so that's really the important distinction for the court to understand here, is that's why he found a chronic violation of the Access Amendments in Probert was because it was the illegal use that over time was leading to those forest land standards being violated year after year, not any one system. You know, I thought that before, before today, the defendants were arguing because the Access Amendment is vague about whether and how you count unauthorized use, the agency should be given deference. But then what I heard today is, oh, no, we're very specific, and it's in the record, you know, here are some sites that this is how we treat unauthorized use. So tell me what you think about, I mean, am I right that there seems to be a slight change in position, or am I just misunderstanding the two? And if it is the first, that there's actually ambiguity such that the agency should be given discretion, then why shouldn't we defer? Thank you, Your Honor. The agency's longstanding position would be the only position entitled to deference. The longstanding position up till 2020 was to include illegal motorized use, even short term. And again, that's at 7-ER-1544. This is the first case where they're arguing that they can exclude illegal road use. And the argument you heard today at oral argument is one that we don't find in the record. That's not in the NEPA methodology section for the EA. So that is a newly formed argument, and so it is entitled to zero deference. And another factor that you look at when determining whether to afford any deference to a Forest Service interpretation of the Forest Plan is that you first have to start by looking at the plain language of the Forest Plan itself, the definitions that are in the Forest Plan itself. And so if we look at what the definitions actually say, the intervener cited to the IGBC document from 1998, that's not the Forest Plan. We have to look at the Forest Plan Record of Decision and the glossary and the definitions that were actually codified into the Forest Plan, not any other document. The Forest Plan definitions say open motorized route density must include all roads not meeting restricted or obliterated criteria. Total motorized route density must include all roads not meeting all reclaimed criteria. Restricted roads must have an effective gate. A reclaimed road must no longer function as a road. That's at Alliances SER 131. Gated roads must be effective. That's at 126. Impassable roads must prohibit. Let me ask just one last question because we're running out of time. Okay, thank you. And we've heard a lot of argument today, and I'd like to wrap this up. So if the agency defined the core and open total motorized route density and explained that route densities would be calculated with GIS applications, why is that insufficient in explaining its methodology? Your Honor, because the most important factor here is what the impact is going to be on the imperiled Cabinet Yak grizzly bear. That is the whole point of the access amendment. And so the fact that they are now for the first time excluding known motorized use that we know is going to harm that population, that known illegal use, that definitely needed to be disclosed to the public in the environmental assessment. That is the Cabinet Yak grizzly bear is maybe the most important issue to the public here, and the most imminent threat to grizzly bears is roads, including illegal roads. Okay, but I guess I'm unclear. You're saying that they made the argument of excluding illegal use for the first time in this case, and I guess the first time today. Is that right? Then what was your previous argument that there was a procedural violation based on that? If this is what you're saying, post hoc rationalization just come up today, then what was your previous procedural defect that you had trouble with? The previous procedural defect was that the NEPA methodology section of the EA did not disclose at all how they calculated road density. Today, to this court, they proposed a methodology that's just not in the EA either. So before the argument was more there's no disclosure at all. Now, today, our argument is shifted to they just gave you a method, but that's not in the record. I think there's a little bit of confusion I have in terms of your choice of the word methodology, and maybe it's trying to fit it into the case law. The method for determining how to classify roads, I guess, was the use of the GIS monitoring. That seems to have been disclosed. What I see you arguing is it's the fact that they sort of viewed a certain amount of unauthorized use essentially as de minimis that was not disclosed adequately. Am I understanding your argument correctly as what they should have more clearly disclosed and did not? Yes, Your Honor. Maybe I should have used the word calculation as opposed to methodology. The calculation should include the illegal roads as it did always prior to 2020 because that is a critical factor that harms grizzly bears. Okay. All right. Do my colleagues have any more questions? Judge Tung? All right. Thank you very much for your helpful argument. And you're welcome not to use your time. You're already over 5 1⁄2 minutes of your 14 minutes. I understand, Your Honor, and I appreciate the additional time. I'd like to first clarify we are both asking for deference on the Forest Service's implementation of its plan, as we asked for in both our opening brief and the third brief, and as we discussed today, substantial deference to factual findings. Our opening presentation and the Court's questions primarily focused on factual findings, and so that's where we focused our attention. But the argument has always been that the Access Standard 2 itself does not speak to this issue. The Forest Service is entitled to deference on that issue, and its factual findings about how to apply that Forest Service plan, Access Standard 2, to the facts ought to be given deference. I'd like to give the Court a site that did not occur during the COVID-19 pandemic for monitoring. 5ER 1068-69 is the site my friend on the other side cited to. Other years show up to 80 or more percent of gates were fixed. 4ER 853 is the site for that. And I would just otherwise point to the additional monitoring reports that are throughout the record. Beyond that, I think we rest on our briefs, and I would urge the Court to reverse with respect to unauthorized use, reverse with respect to the population density or population size estimate, and affirm with respect to jeopardy. All right, thank you. Let me just check with my colleagues. Judge Sung, do you have any more questions? No. All right, thank you. Thank you to all counsel. These were very helpful arguments. We're going to take a 10-minute break. All rise.
judges: BEA, KOH, SUNG